IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

DAVID ELLIOT CAMPBELL,⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀⠀⠀⠀⠀⠀4:09CV3237
⠀⠀⠀⠀⠀⠀⠀Plaintiff,⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀vs.⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀⠀⠀MEMORANDUM AND ORDER
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
MICHAEL J. ASTRUE, Commissioner⠀)
of the Social Security Administration,⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀Defendant.⠀⠀⠀⠀⠀)

⠀⠀⠀⠀This is an action for judicial review of a final decision of the Commissioner of the

Social Security Administration ("the Commissioner").  Plaintiff David Elliot Campbell

("Campbell") appeals the Commissioner's decision to deny his applications for disability

insurance benefits under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 401 *et*

*seq.*, and for Supplemental Security Income ("SSI") benefits under Title XVI of the Act, 42

U.S.C. §§ 1381 *et seq.*   This court has jurisdiction under 42 U.S.C. §§ 405(g) and

1383(c)(3).

⠀⠀⠀⠀Campbell filed an application for disability benefits on May 5, 2006, alleging that he

became unable to work on April 30, 2005, due to a disabling condition.  Social Security

Transcript ("Tr.") 49.  The record indicates that Campbell also filed an application for SSI

benefits on May 31, 2006, *e.g.*, Tr. 11, though the court has been unable to locate this

application in the transcript.   After his applications were denied initially and on

reconsideration, Tr. 30-31, 39-48, Campbell requested a hearing before an Administrative

Law Judge ("ALJ"), Tr. 28.  That request was granted, Tr. 20-24, and a "video hearing" was

held on February 19, 2009, Tr. 11.  *See also*, *e.g.*, Tr. 186.  After this hearing, the ALJ

issued a decision stating that (1) Campbell "meets the insured status requirements of the

Social Security Act through September 30, 2011"; (2) Campbell "has not engaged in substantial gainful activity since April 30, 2005, the alleged onset date"; (3) Campbell has heart disease and "a bipolar disorder," both of which are "severe impairments"; (4) Campbell "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1"; (5) Campbell retains the residual functional capacity ("RFC")[1] "to lift and/or carry 50 pounds occasionally and 25 pounds frequently; stand and/or walk 6 hours and sit 6 hours in an 8-hour day; [have] occasional contact with the public; and no commercial driving"; (6) Campbell "is capable of performing past relevant work as a laborer stores"; and (7) Campbell was not disabled from April 30, 2005, through the date of the ALJ's decision.  Tr. 13, 15, 17.  Campbell requested review of the ALJ's decision, Tr. 7, but the Appeals Council denied this request on September 23, 2009, Tr. 4-6.  Campbell then filed this action in the United States District Court for the District of Nebraska.  Filing No. 2.

## BACKGROUND

Campbell alleges that he has been unable to work since April 30, 2005, due to his bipolar disorder and heart disease.  Tr. 62, 201-202.  He was 34 years old on the date of his alleged onset of disability.  Tr. 58.  He earned a GED in 1992.  Tr. 67.  Prior to the alleged onset date, Campbell worked as a truck driver, stocker, and plastic mold operator. Tr. 63, 89.  When discussing the latter position during the administrative hearing, however, Campbell clarified that he worked as a laborer rather than a machine operator.  Tr. 213.

---

[1] Residual Functional Capacity is defined as the claimant's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, i.e., eight hours a day, five days a week, or an equivalent work schedule.  SSR 96-8p, 1996 WL 374184 (July 2, 1996).  *See also* 20 C.F.R. §§ 404.1545(a), 416.925

In the years since his alleged onset date, Campbell has worked briefly as a truck driver and as a custodian.  Tr. 198-199.

On July 12, 2005, Campbell visited Dr. Matthew Houseal at the Texas Panhandle MHMR OutPatient Clinic and reported that he has a fifteen-year history of "irritability, anger, and brief spells of low mood."  Tr. 117-118.[2]  He stated that he had lost his job as a truck driver three months previously because he was "sleeping instead of driving."  Tr. 117.  He also stated that he saw a doctor in Nebraska ten years ago, and that he had a "partial response" from medication, but he had not received any treatment during the past ten years.  Tr. 117.  Dr. Houseal diagnosed Bipolar Disorder (provisionally), indicated that Campbell's GAF score[3] was currently 56, opined that Campbell's overall functioning was a "6" on a scale of 0 (low) to 10 (high), and prescribed medication for Campbell.  Tr. 118.

Campbell followed up with Dr. Houseal on July 28, 2005, and reported having a "substantial response" to the medication that had been prescribed for him earlier in the month.  Tr. 115.  He said that his mood and sleep had improved, his irritability had decreased, and that he "feel[s] like a different person."  Tr. 115.  Dr. Houseal again diagnosed Bipolar Disorder provisionally, but he found that Campbell's GAF score had improved to 62, and his overall functioning was now "7."  Tr. 116.  Dr. Houseal also indicated that Campbell's symptoms, including irritability, had all improved since his last visit.  *Compare* Tr. 116 *with* Tr. 118.

---

[2] Though dated approximately two months later than the alleged onset date, this record of July 12, 2005, appears to the earliest in the record.

[3] "The GAF is a numeric scale ranging from zero to one hundred used to rate social, occupational and psychological functioning 'on a hypothetical continuum of mental health-illness.'" *Pate-Fires v. Astrue*, 564 F.3d 935, 937 n.1 (8th Cir. 2009) (quoting American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 1994)).

3

On August 26, 2005, Campbell was evaluated by Dr. Addison E. Gradel, a neuropsychologist, pursuant to a referral from a vocational rehabilitation counselor. *See* Tr. 99-103. Campbell reported no problems bathing, dressing, or maintaining personal hygiene, and he reported that he cooks, shops, attends church, and prepares laundry. Tr. 100. He said that his current hobbies were mechanics and welding. Tr. 100. Dr. Gradel noted that Campbell's speech was normal, that he "initiated conversation," that he made "good eye contact," that his "mood was pleasant with an overly vigilant affect," that he was congenial and cooperative, and that he "was able to sustain sedentary individual attention to task for 2 hours without taking a break." Tr. 100. Campbell's Verbal IQ, Performance IQ, and Full Scale IQ were "within lower normal limit[s]." Tr. 101. Dr. Gradel diagnosed "Mood disorder: Medication Managed," and "Impulse control disorder: Medication managed," and assigned a GAF score of 55. Tr. 103.

On September 8, 2005, Campbell followed-up with Dr. Houseal, who noted that Campbell's mood was "stable" and sleep was "OK." Tr. 112. He also noted that Campbell was "planning to take welding classes." Tr. 112. Dr. Houseal found that Campbell's GAF score was 64, and that his overall functioning was "8." Tr. 114.

On November 18, 2005, Campbell visited Dr. Houseal once again and reported that he was asymptomatic. Tr. 110. Campbell indicated that he had a new job, but he complained that his job was "not as good as [he] could have had," and he blamed his doctor for his failure to obtain a higher-paying job. Tr. 110. Dr. Houseal found that Campbell's GAF score remained 64, and his overall functioning remained "8." Tr. 109.

On March 30, 2006, Campbell visited Dr. Randall G, Sullivan, a psychiatrist, at Psychiatric Medicine Associates of North Platte, Nebraska. Tr. 127-128. Dr. Sullivan

4

indicated that Campbell had been referred to him by Campbell's mother "because of mood irritability."  Tr. 127.  He also indicated that he had a previous contact with Campbell about ten years ago, but had not seen him since then.  Tr. 127.  Campbell reported that he had been diagnosed with bipolar disorder and that he "has very significant changes in mood." Tr. 127.  He also reported that he was started on medication at a mental health center in Texas, and that the medication "worked pretty good but he doesn't always have the medications."  Tr. 127.  Dr. Sullivan wrote, "I think this patient most likely has bipolar disorder.  It appears he has some components of a mixed disorder but no evidence of psychosis.  He does not appear to be at risk for suicide at this point.  And he does appear to be cooperative in taking medications. . . ."  Tr. 128.  He prescribed medication and asked Campbell to return for a follow-up in approximately one month.  Tr. 128.

Campbell returned to Dr. Sullivan for a follow-up on May 8, 2006.  Tr. 125.  Dr. Sullivan wrote, "David thinks that he is in about the right mood phase at the present time. He can enjoy things.  He is sleeping pretty well.  His mood varies with events around him. He says he gets a bit hyper and recognizes it and can control it.  He does not want to make any medication changes."  Tr. 125.  After examining Campbell, Dr. Sullivan indicated that "[h]is mental status is generally normal with no significant or particularly outstanding signs of mania other than the [sic] talks a bit brightly at times."  Tr. 125.  Dr. Sullivan diagnosed Bipolar I Disorder, Most Recent Episode Mixed, Severe Without Psychotic Features, assessed "Mild symptoms and/or distress," and noted that Campbell was showing improvement with his current medications.  Tr. 125.

On June 10, 2006, Campbell completed a supplemental disability report.  Tr. 69-72. On this report, Campbell indicated that when he is not using his medication, he does not

5

want to do any social activities and has difficulty sleeping.  Tr. 69, 71.  He indicated that his medication helps him engage in activities with his family, reduces his anxiety, and improves his life overall, but he added that it also causes him drowsiness.  Tr. 69-72.

On August 17, 2006, Campbell returned to Dr. Sullivan for a follow-up.  Tr. 120. Campbell reported that he had a hard time staying on his medications because of "financial issues."  Tr. 120.  Dr. Sullivan provided him with samples of medications and advised him to return in one month.  Tr. 120.

On October 3, 2006, Christopher Milne, Ph.D., "reviewed all of the evidence in the file" and "affirmed" the Psychiatric Review Technique form completed on July 6, 2006, by Patricia Newman, Ph.D.  Tr. 132.  Dr. Newman concluded that Campbell suffered from "non-severe" bipolar disorder that does not "severely limit his work abilities at this time." Tr. 145.

On November 16, 2006, Campbell visited Dr. Sullivan for a follow-up at the Great Plains Regional Medical Center.  Tr. 163.  Campbell reported that "he had a bit of a manicky episode a couple of weeks ago," but he took is medication "for a few days . . . and this calmed him down quite well."  Tr. 163.  He also reported a period of depression, but he said that it resolved.  Tr. 163.  He said that his medication was not causing any significant side effects, "except possibly some intermittent weight gain."  Tr. 163.  Dr. Sullivan noted that Campbell's weightlifting might be contributing to his weight gain.  Tr. 163.  Dr. Sullivan found that Campbell was alert, oriented, "fairly cheerful," coherent, positive, and upbeat.  Tr. 163.  He diagnosed bipolar disorder, type I, most recently manic, and assigned a GAF score of "[a]bout 60."  Tr. 163.  Campbell was directed to return for a follow-up "in two to three months unless there are problems."  Tr. 163.

Campbell returned to Dr. Sullivan on January 11, 2007.  Tr. 162.  He reported that "really his mood has been quite good and he [is] sleeping well and feeling good."  Tr. 162. He also reported, however, that he had been "having chest pain when he exercises."  Tr. 162.  Dr. Sullivan ordered an EKG and cholesterol and blood sugar checks, and Campbell was directed to call back "in the next day or two" to review the results.  Tr. 162.

On March 12, 2007, Campbell returned for another follow-up with Dr. Sullivan.  Tr. 161.  He reported that he was doing "pretty well," but he was feeling more depressed and more irritable.  Tr. 161.  He said that one of his medications was making his legs feel "funny and achy," and he reported feeling tired.  Tr. 161.  Dr. Sullivan assigned a GAF score of "[a]bout 50," and he made some changes to Campbell's medication regimen.

Campbell followed-up with Dr. Sullivan again on April 23, 2007.  Tr. 160.  Campbell reported that he was "doing quite a bit better."  Dr. Sullivan continued Campbell on his current medications.  Tr. 160.

On June 1, 2007, Campbell reported to Dr. Sullivan that he was doing "pretty good with his medications" and was working in a part-time job.  Tr. 159.  Dr. Sullivan assigned a GAF score of "[a]bout 50," and continued Campbell's medications.  Tr. 159.

Campbell visited Dr. Sullivan again on August 1, 2007, and was "doing pretty well." Tr. 158.  He did report, however, that he felt "paranoid and somewhat suspicious of things sometimes."  Tr. 158.  Dr. Sullivan noted that Campbell was doing quite well with his current medications, but "he needs samples because of financial issues."  Tr. 158.  Dr. Sullivan assigned a GAF score of 50 and made some changes to Campbell's medication regimen.  Tr. 158.

Campbell followed-up with Dr. Sullivan again on September 11, 2007.  Tr. 157.  Dr. Sullivan noted that Campbell had "been fairly manic" since his last visit, and his children and mother had "called a couple of times."  Tr. 157.  Campbell's family was able to "manage him at home," and he began "calming down" during the previous week.  Tr. 157. Campbell complained to Dr. Sullivan of feeling depressed, but he was also alert, oriented, cooperative, and able to demonstrate insight regarding the effects of his moods on his family.  Tr. 157.  Dr. Sullivan again assigned a GAF score of 50 and made additional changes to Campbell's medications.  Tr. 157.

On November 12, 2007, Campbell reported to Dr. Sullivan that he had been "doing pretty well in the last two months."  Tr. 156.  His mood and sleep had been "okay," and he had been "taking better care of himself" and "working out."  Tr. 156.  He said that "he was feeling so good he did some kind of risky sexual things," and he wanted to have some testing for STDs.  Tr. 156.  Dr. Sullivan assigned a GAF score of 50, referred Campbell to a clinic for STD testing, and continued Campbell's medications.  Tr. 156.

On December 21, 2007, Campbell followed-up with Dr. Hemanth Bhimasani at the Great Plains Regional Medical Center.  Tr. 155.  Dr. Bhimasani noted that Campbell was stable, alert, oriented, and cooperative, and although he was "a little distracted during the interview," he had "fairly good insight and judgment."  Tr. 155.  Campbell complained that one of his medications was causing undesirable side effects, so he stopped taking it.  Tr. 155.  Dr. Bhimasani prescribed a different medication to replace the discontinued one and planned to revisit with Campbell in one month.  Tr. 155.

Campbell followed-up with Dr. Bhimasani on January 10, 2008.  Tr. 154.  Prior to his office visit, Campbell reported that the new medication he started during the last month

8

helped with his racing mind, anxiety, depression, and mood swings, but "he started developing some shooting feeling in the neck and some pain in the auxiliary area."  Tr. 154. Dr. Bhimasani recommended that Campbell stop the medication and come in for his follow-up on January 10.  Tr. 154.  Campbell reported mild mood swings, "mild racing mind," and some anxiety, but overall he seemed to be doing okay.  Tr. 154.  Dr. Bhimasani made changes to Campbell's medication, assigned a GAF score of 61, and scheduled Campbell for another follow-up in one month.  Tr. 154.

On March 3, 2008, Campbell followed-up with Dr. Bhimasani and reported that he had been "observing some irritability and anger" periodically.  Tr. 177.  He also reported that one of his medications seems to have caused him to develop a rash on his trunk.  Tr. 177.  Campbell indicated that he wanted to continue with one particular medication and have a trial of another, but Dr. Bhimasani noted, "Since there are no samples available at this point, patient has difficulties with finances, difficulty purchasing medications, so together we are trying to work him around with sample medications we have in the office." Tr. 177.  Dr. Bhimasani made changes to Campbell's medications and assigned a GAF score of 61.  Tr. 177-178.

Campbell followed-up with Dr. Gordon McCamley on March 27, 2008.  Tr. 175-176. Campbell reported that he increased the dosage of one of his medications "on his own" because he was having difficulty sleeping, but this was causing him to experience "a rapid heartbeat."  Tr. 175.  He reported that other than this, he was "doing much better than normal."  Tr. 175.  Dr. McCamley made changes to Campbell's medication regimen and assigned a GAF score of 65.  Tr. 175-176.

On August 22, 2008, Campbell followed-up with a Dr. Adeladan, who noted that Campbell "[u]sed to be Dr. Sullivan's patient" and later saw Drs. McCamley and Bhimasani. Tr. 167.  Campbell reported that he was having difficulty sleeping, that "he feels people are staring at him," and that he had been feeling depressed and sometimes suicidal.  Tr. 167. Dr. Adeladan assigned a GAF score of 55 and made changes to Campbell's medications. Tr. 167-168.

Campbell followed-up with Dr. Adeladan on September 8, 2008, and reported that he was doing well on his medications.  Tr. 166.  He said that he no longer felt that people were staring at him, no longer felt suicidal, and was "in a good mood."  Tr. 166.  He also reported that his medications caused his heart to beat "very fast" when taken together, so he separated his doses by two hours.  Tr. 166.  Dr. Adeladan assigned a GAF score of 55, noted that Campbell was improving, and continued his medications.

On September 19, 2008, Campbell reported to Dr. Adeladan that "[h]e just had a cardiac catheterization, and was told he had 80% blockage."  Tr. 165.  He added that he was "scheduled to have a stent placed."  Tr. 165.  He told Dr. Adeladan that he came in for a checkup because his medications cause his heartbeat to accelerate.  Tr. 165.  Dr. Adeladan made adjustments to Campbell's medications.  Tr. 165.

On September 30, 2008, Campbell underwent an outpatient cardiac catheterization and selective coronary angiography at the Nebraska Heart Hospital in Lincoln, Nebraska. Tr. 147-153.  The "catheterization revealed a lesion of the left anterior descending," and an "angiography of the left anterior descending showed myocardial bridging with some spasm."  Tr. 147.  Campbell's medications were adjusted, and he was directed to follow up with Dr. Rick Heirigs on October 14, 2008.  Tr. 147.

On October 8, 2008, Campbell reported to Dr. Adeladan that he did not go to Omaha to have a stent placed because "it was found that he did not have any blockage, just a coronary spasm."  Tr. 164.  He also reported that he was doing well on his medication, and he was "hopeful that he might be getting a job soon."  Tr. 164.  Dr. Adeladan assigned a GAF score of 55 and continued Campbell on his medications.  Tr. 164.

Campbell reported to the Nebraska Heart Institute in North Platte, Nebraska, on October 14, 2008, for a follow-up regarding his heart catheterization.  Tr. 169.  The record, which is signed by Dr. Heirigs, includes the following account of Campbell's history:

> He presented with intermittent chest pain and had inferior ischemia on Cardiolite.  Heart catheterization subsequently performed by myself which showed 80% left anterior descending lesion and was reviewed with Dr. Korpas and sent to Lincoln for percutaneous coronary intervention. However, on repeat heart catheterization there was noted to be actual spasm and myocardial bridging and no significant lesion and Norvasc was initiated.

Tr. 169.  The record continues,

> The patient reports he is now doing well.  He denies any episodes of chest pain.  He says if he does skip his Norvasc he will have some chest pain.  He says it causes increased fatigue so he's been taking 1/2 tablet daily of the 2.5 Norvasc and it has alleviated his chest pain.  He is wondering if he can switch his Coreg back to his atenolol since he does have headaches. He does go to the gym and lift weights.  He also does cardio workout including 10 minutes on the bike and 10 minutes on a treadmill.  He has no specific complaints today.

Tr. 169.  Dr. Heirigs examined Campbell and noted that he "is doing well from a cardiac perspective."  Tr. 170.  He made no adjustments to Campbell's "medical therapy," and he directed Campbell to follow-up in six months.  Tr. 170.

On January 2, 2009, Dr. Adeladan completed a form for the Nebraska Health and Human Services System.   Tr. 172-173.   On this form, Dr. Adeladan indicated that

11

Campbell suffers from "Bipolar disorder - depressed," that his disorder is expected to be "lifelong" with "continuing maintenance therapy necessary," and that Campbell is "unable to hold a job." Tr. 172-173. Dr. Adeladan also indicated that Campbell had no limitations in his "activities of daily living" and no "[s]pecific restrictions of physical activity." Tr. 173.

Dr. Adeladan completed another questionnaire on February 13, 2009. Tr. 182-185. On this questionnaire, Dr. Adeladan indicated that Campbell has a marked difficulty in maintaining social functioning due to "elevated and irritable moods"; that he suffers deficiencies in concentration, persistence, or pace due to his "irritable, hyperactive, elevated moods"; that he is expected to suffer episodes of deterioration or decompensation continually; and that his illness significantly limits his ability to hold a job. Tr. 183-185. He indicated that Campbell's GAF score was 55. Tr. 182.

On February 19, 2009, Campbell testified at the administrative hearing before the ALJ. Tr. 186. Campbell said that he can cook, clean, do laundry, and handle his "personal grooming needs" without assistance. Tr. 194. He said that he exercises once or twice per week, sometimes plays chess, watches television, reads the newspaper, and visits with family. Tr. 194-195. He lives alone in a house rented by his mother. Tr. 209. Campbell estimated that he could lift less than forty pounds. Tr. 203. He testified that his medication causes him to fall asleep when he is sitting down. Tr. 202-203. He added that his bipolar disorder causes him "[a] lot of confusion," and he feels depressed and suicidal, but his medication helps him. Tr. 203-204. Campbell testified that he could not return to his work as a truck driver because his medications cause him to be drowsy, and if he does not take his medication he suffers confusion and "racing thoughts." Tr. 206-207. He testified that he could not return to his job as a laborer working with plastic parts because he would be

"accident[] prone" and would have problems getting along with coworkers.  Tr. 208; *see also* Tr. 213.  He also testified that he could not return to his work as a stocker because he would not be able to get along with people.  Tr. 208.  He said that people "just despise" him, and he is uncomfortable when he is around people.  Tr. 210.  Campbell also said that for a stretch of three or four days each month, he has sleepless episodes that leave him irritable and confused.  Tr. 211-212.

The ALJ then asked a Vocational Expert ("VE") to consider a hypothetical person of Campbell's age, education, and work history who "could lift 50 pounds on occasion and 25 frequently," "[s]it, stand, and or walk six out of eight hours, could have only occasional contact with the public, and could do no commercial driving."  Tr. 214-215.  He then asked the VE whether this hypothetical person could perform any of Campbell's past relevant work.  Tr. 215.  The VE responded that such a person could perform Campbell's past work as a laborer, noting that the relevant position is called "laborer of stores" in the Dictionary of Occupational Titles.  Tr. 215.

## STANDARD OF REVIEW

When reviewing the decision not to award disability benefits, the district court does not act as a fact-finder or substitute its judgment for the judgment of the ALJ or the Commissioner.  *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995).  Rather, the court must review the Commissioner's decision in order to determine "whether there is substantial evidence based on the entire record to support the ALJ's factual findings."  *Johnson v. Chater*, 108 F.3d 178, 179 (8th Cir. 1997) (quoting *Clark v. Chater*, 75 F.3d 414, 416 (8th Cir. 1996)).  "Substantial evidence is less than a preponderance but is enough that a

reasonable mind would find it adequate to support the conclusion." *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008) (citations and internal quotation marks omitted).  A decision supported by substantial evidence may not be reversed, "even if inconsistent conclusions may be drawn from the evidence, and even if [the court] may have reached a different outcome."  *McNamara v. Astrue*, 590 F.3d 607, 610 (8th Cir. 2010).  Nevertheless, the court's review "is more than a search of the record for evidence supporting the Commissioner's findings, and requires a scrutinizing analysis, not merely a 'rubber stamp' of the Commissioner's action."  *Scott ex rel. Scott v. Astrue*, 529 F.3d 818, 821 (8th Cir. 2008) (citations, brackets, and internal quotation marks omitted).  *See also Finch*, 547 F.3d at 935 (explaining that the court must consider evidence that detracts from the Commissioner's decision in addition to evidence that supports it).

The court must also determine whether the Commissioner's decision "is based on legal error."  *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000).  The court does not owe deference to the Commissioner's legal conclusions.  *See Juszczyk v. Astrue*, 542 F.3d 626, 633 (8th Cir. 2008); *Brueggemann v. Barnhart*, 348 F.3d 689, 692 (8th Cir. 2003).

## LAW

A disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505; *see also* 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 416.905(a).  To determine whether a claimant is disabled, the Commissioner must perform the five-step sequential analysis described in

the Social Security Regulations.   *See* 20 C.F.R. §§ 404.1520(a), 416.920(a).   More specifically, the Commissioner must determine:   "(1) whether the claimant is engaged in any substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals  an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) whether the claimant can return to [his] past relevant work; and (5) whether the claimant can adjust to other work in the national economy."   *Tilley v. Astrue*, 580 F.3d 675, 678 n.9 (8th Cir. 2009); *see also Kluesner v. Astrue*, 607 F.3d 533, 536-37 (8th Cir. 2010).   "Through step four of this analysis, the claimant has the burden of showing that [he] is disabled."   *Steed v. Astrue*, 524 F.3d 872, 874 n.3 (8th Cir. 2008).  After the analysis reaches step five, however, "the burden shift[s] to the Commissioner to show that there are other jobs in the economy that [the] claimant can perform."   *Id.*

## DISCUSSION

As noted above, in this case the Commissioner reached step four of the sequential analysis and determined that because Campbell could return to his past work as a laborer, he was not disabled.  Tr. 17.  Campbell seeks an order reversing this decision because A) the ALJ erred in formulating Campbell's RFC; B) the ALJ's finding that Campbell can return to his past relevant work does not satisfy the requirements of Social Security Ruling 82-62 and Eighth Circuit case law; and C) the ALJ improperly discounted the opinion of Campbell's treating psychiatrist.  *See* Filing No. 18 at 2-3.

### A.  RFC

Campbell argues first that the ALJ applied the incorrect legal standard when assessing Campbell's RFC.  Filing No. 18 at 4.  More specifically, he argues that 1) the ALJ

did not consider properly whether Campbell was able to sustain work on a "regular and continuing basis"; 2) the ALJ's RFC determination fails to address the lifting, standing, walking, stooping, and crawling requirements of medium work; 3) the ALJ's RFC determination does not properly account for Campbell's difficulties in social functioning; and 4) the ALJ did not properly take into account the side effects of Campbell's medications. Filing No. 18 at 5-11. The court will consider each of these arguments in turn.

**The Applicable Legal Standard:** Campbell argues that the ALJ did not use the correct legal standard when determining whether Campbell's RFC would allow him to return to his past relevant work. Filing No. 18 at 4-7. Social Security Ruling (SSR) 96-8p states, "In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record." 1996 WL 374184, at *7 (July 2, 1996) (footnote omitted). In other words, "[t]he evidence must show the claimant has 'the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real word'"; otherwise, the claimant is unable to work. *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007) (quoting *McCoy v. Schweiker*, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc), *abrogated on other grounds*, 524 U.S. 266 (1998)). *See also* 42 U.S.C. §§ 416(i)(1)(A), 1382c(3)(A) (defining "disability"

as an "inability to engage in any substantial gainful activity"); *Dukes v. Barnhart*, 436 F.3d 923, 927 (8th Cir. 2006) (defining substantial gainful activity).

In the instant case, the ALJ set forth the legal standard that he applied at step four of the sequential analysis, stating,

> Before considering step four of the sequential evaluation process, I must first determine the claimant's residual functional capacity. An individual's residual functional capacity is his *ability to do physical and mental work activities on a sustained basis* despite limitations from his impairments. . . .
>
> Next, I must determine at step four whether the claimant has the residual functional capacity to perform the requirements of past relevant work.  The term past relevant work means work performed (either as the claimant actually performed it or as it is generally performed in the national economy) within the last 15 years . . . .  In addition, the work must have lasted long enough for the claimant to learn to do the job and have been [substantial gainful activity].

Tr. 12-13 (citations omitted) (emphasis added).  In short, the ALJ's decision states clearly that when determining whether a claimant is disabled at step four, the ALJ must consider whether the claimant can "do physical or mental work activities on a sustained basis" that would allow him to meet the requirements of his "past relevant work." Tr. 12-13.  The court finds that the ALJ understood the need to assess Campbell's ability to perform sustained work activities and did not apply the incorrect standard when determining whether Campbell could return to his past relevant work.

Campbell dismisses the foregoing excerpt from the ALJ's decision as "boilerplate," and he submits that "[t]he Commissioner made no attempt to reconcile that boilerplate statement with the ALJ's actual and repeated reliance on evidence of activities whose duration and frequency either were unknown or, where known, fell far short of adding up

17

to forty hours per week." Filing No. 22 at 2.  The court takes Campbell's argument to be that, although the ALJ set forth the correct legal standard in his decision, the ALJ did not apply this standard when analyzing Campbell's particular case.

Campbell supports his argument with references to a number of phrases excerpted from the ALJ's decision.  *See* Filing No. 18 at 5-7.  Specifically, he states that the phrases "do his past relevant work," "do any other work," and "the claimant's ability to do basic work activities" all indicate that the ALJ neglected to consider Campbell's ability to *sustain* work. Filing No. 18 at 5 (quoting Tr. 13, 15).  He also suggests that the ALJ's discussion of medical records indicating that Campbell was doing "well," was "stable," was hoping to get a job, or was engaging in certain daily activities all show that the ALJ was not focused on the question of *sustainable* work.   Filing No. 18 at 6-7 (citing Tr. 16).   The court has considered these excerpts and finds that the ALJ's references to these matters were permissible and, more to the point, do not show that the ALJ disregarded the proper legal standard.

In his reply brief, Campbell adds that the ALJ's discussion of his RFC "in the context of an eight-hour workday" did not meet the requirements of SSR 96-8p because it "addresses a single day without saying whether the exertions achieved during that eight hours could be sustained" on a regular and continuing basis. Filing No. 22 at 2.  He adds that the ALJ's hypothetical is defective because it "refers to 'eight hours' without saying whether those hours are consecutive."   Filing No. 22 at 3. In a similar vein, Campbell criticizes the ALJ's references to the "Physical Exertion Requirements" outlined in 20 C.F.R. §§ 404.1567(c) and 416.967(c), arguing–despite the ALJ's clear use of the terms

"occasionally" and "frequently"–that the ALJ's references "explicitly tie[] the RFC to the amount Mr. Campbell can lift 'at a time,'" as opposed to "repeatedly." Filing No. 22 at 2. Each of these arguments depends on the premise that the ALJ disregarded the working definition of "residual functional capacity" that he set forth in his decision, as his definition explicitly incorporates the concept of sustainable work. The court sees nothing in the ALJ's decision indicating that such a disregarding took place.

In summary, the court finds that the ALJ sought to determine the extent to which Campbell could perform work-related functions on an occasional or frequent basis and the extent to which he could stand or sit during the course of an eight-hour workday, and in so doing, he endeavored to made a "realistic assessment" of Campbell's ability to work eight hours per day, five days per week. *Juszczyk v. Astrue*, 542 F.3d 626, 633 (8th Cir. 2008). Campbell's arguments that the ALJ failed to apply the correct legal standard are rejected.

**Lifting Limitations:** Campbell argues that although the ALJ found that he has the RFC "to lift and/or carry 50 pounds occasionally and 25 pounds frequently," there is no medical evidence in the record to support this finding. Filing No. 18 at 8. He adds that the position of laborer stores "may require constant lifting of up to ten pounds," and the ALJ's RFC determination "does not address the capacity for constant lifting."

A claimant's residual functional capacity is a medical question; therefore, "[s]ome medical evidence must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace." *Masterson v. Barnhart*, 363 F.3d 731, 738 (8th Cir. 2004) (citations and quotation marks omitted). RFC must be assessed "based on all relevant evidence," however. *Id.* (citation omitted). Thus, "[i]n evaluating a claimant's RFC, the ALJ is not

limited to considering medical evidence, but is required to consider at least some supporting evidence from a professional." *Id.* (citations omitted).

It is true that there is no medical evidence in the record stating specifically that Campbell can lift 50 pounds occasionally and 25 pounds frequently.  Nor, however, is there any medical evidence indicating that Campbell's ability to lift is more limited than the ALJ concluded.  Indeed, it appears that no treating or examining physician ever imposed any lifting restrictions on Campbell, and Dr. Adeladan indicated specifically that Campbell had no restrictions on his ability to lift.  Tr. 173.  The absence of medical evidence indicating that Campbell's ability to lift is limited undermines Campbell's claim of disability.  *See Hensley v. Barnhart*, 352 F.3d 353, 357 (8th Cir. 2003).  *See also, e.g.*, *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (explaining that it is the claimant's burden to establish his RFC).  It does not undermine the lifting limits that the ALJ included in his RFC determination after reviewing *all* of the evidence, including evidence about Campbell's daily activities and exercise and the medical evidence concerning his cardiac condition.

In challenging the ALJ's findings regarding lifting, Campbell relies heavily on his own testimony.  *See* Filing No. 18 at 8-9.  The court notes, however, that the ALJ discredited Campbell's testimony insofar as it was inconsistent with the RFC assessment, and Campbell has not challenged the ALJ's credibility determination.

In summary, the court rejects Campbell's argument that the ALJ erred in formulating Campbell's RFC by including lifting restrictions that are not supported by medical evidence.  Although there is no medical evidence indicating specifically that Campbell's ability to lift is limited in any way, the ALJ's decision to impose a lifting limit is supported by medical evidence about Campbell's cardiac condition and other evidence in the record.  Campbell

cites no medical evidence that would support more restrictive limits on lifting.  The court finds that the lifting component of the ALJ's RFC determination is supported by substantial evidence, and it will not be disturbed.

Noting that, "according to the Dictionary of Occupational Titles, . . . the Laborer, Stores job . . . may require constant lifting of up to ten pounds," Campbell also argues that because the ALJ's RFC finding "does not address the capacity for constant lifting," it "does not support the conclusion that Mr. Campbell can return to his job."  Filing No. 18 at 9. More specifically, he submits that the ALJ's failure to address the possibility that a Laborer, Stores job may require constant lifting of zero to ten pounds violates the "requirement of a function-by-function analysis" that inheres in SSR 96-8p.  Filing No. 18 at 9.

Campbell's argument is without merit.  There is no requirement that the ALJ perform a "function-by-function analysis" that covers *all* of a claimant's functional capacities.  Social Security Ruling 96-8p states, "When there is no allegation of a physical . . . limitation or restriction of a specific functional capacity, and no information in the case record that there is a limitation or restriction, the adjudicator must consider the individual to have no limitation or restriction with respect to that functional capacity."  1996 WL 374184, at *1 (July 2, 1996).  There was no allegation in this case that Campbell had any restrictions on his ability to perform constant lifting of up to ten pounds, and Campbell refers me to no information in the case record indicating that there is such a limitation or restriction.  The ALJ was therefore correct to consider that Campbell's ability to perform constant lifting of up to ten pounds was not limited.

**Standing, Walking, Bending, Stooping, and Crouching:**  Campbell argues next that the ALJ's finding that he can stand or walk for six hours during an eight-hour workday

is unsupported by medical evidence.  Filing No. 18 at 9-10.  He adds that "the ALJ's decision does not support a conclusion that Mr. Campbell can do medium work, including the job of Laborer, Stores," because medium work frequently requires bending, stooping, and crouching, and "[t]he ALJ made no RFC finding as to bending, stooping, or crouching."  Filing No. 18 at 10.

Campbell's arguments mirror those discussed immediately above.  First, although Campbell claims that no medical evidence supports the ALJ's finding that he can stand or walk for six hours during an eight-hour workday, he refers me to no medical evidence indicating that his ability to stand or walk is more limited than this.  Instead, he relies solely on his own testimony that he suffers pain in his back and feet when he stands for more than one hour.  Filing No. 18 at 9.  The ALJ discredited this testimony, and Campbell has not challenged the ALJ's credibility determination.  Also, Dr. Adeladan reported that Campbell had no restrictions in his ability to sit, walk or stand.  Tr. 173.  In light of Dr. Adeladan's report and the evidence in the record as a whole, the court cannot say that the ALJ's findings concerning Campbell's ability to stand and walk are not adequately supported.

Second, Campbell has made no allegations that his abilities to bend, stoop, or crouch are restricted in any way, and he cites no information in the record indicating that any such restrictions have ever existed.  Under these circumstances, the ALJ was required to consider that Campbell had no restrictions in bending, stooping, or crouching, *see* SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1998), and the court must reject Campbell's argument that the ALJ erred by failing to make specific RFC findings about those particular functional capacities.

**Social Functioning:**  Campbell argues that the ALJ erred by failing to make a finding about Campbell's "ability to deal with coworkers and supervisors or otherwise deal with pressures in the work setting."  Filing No. 18 at 10.  He notes that Dr. Adeladan's report and Campbell's own testimony about his "restricted social life" indicate that Campbell would have difficulty meeting "the social interaction demands" of his past work, and he seems to suggest that a finding of "no limitations" on this point would not be supported by substantial evidence.  Filing No. 18 at 10-11.

In opposition to Campbell's argument, the Commissioner claims that because the ALJ "properly rejected Dr. Adeladan's opinion," he "was not required to include any of his suggested limitations in the RFC."  Filing No. 21 at 20.

The court will address below whether the ALJ properly rejected Dr. Adeladan's opinions, *see infra* Part C., and for the present, that issue will be set aside.  The record contains much information–apart from Dr. Adeladan's report–describing the ways in which Campbell's mental impairment affects his social functioning.  For example, there is evidence that Campbell's bipolar disorder causes him irritability, anger, mood instability, depression, and paranoia.  On occasion, Campbell's mother and children have had difficulty helping him manage these symptoms.  *E.g.*, Tr. 157.  Although the record shows that Campbell's symptoms respond well to medication, it does not show that medication fully restores Campbell's ability to deal with work stresses, supervisors, coworkers, and people in general.  His GAF score history, for example, suggests that Campbell's bipolar disorder continued to have some impact on his functioning even when he was able to

obtain medication.[4]  Also, Campbell's testimony about his daily activities indicates that he avoids contact with others.

Moreover, when documenting in his decision the application of the psychiatric review technique described in 20 C.F.R. §§ 404.1520a and 416.920a, the ALJ himself concluded that Campbell has moderate difficulties in social functioning.  Tr. 14.  Clearly, this finding is consistent with the information in the record.  When proceeding to step four of the sequential analysis, however, the ALJ must make "a more detailed [mental RFC] assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings." SSR 96-8p, 1996 WL 374184, at *4 (July 2, 1996).  The ALJ recognized this obligation in his decision, *see* Tr. 14-15, but in fulfilling it, he stated only that Campbell retained the RFC to have "occasional contact with the public," Tr. 15.  The ALJ did not indicate whether Campbell's ability to respond appropriately to supervisors and coworkers or his ability to deal with the pressures of a work setting were also limited, and the court agrees with Campbell that to the extent the ALJ found that there were no such limitations, the ALJ's finding is not supported by substantial evidence in the record.

The court is persuaded that the ALJ failed to make an adequate assessment of Campbell's moderate difficulties in social functioning when formulating his mental RFC. A remand is necessary to address this deficiency.

---

[4] The court recognizes that GAF scores are not essential to an accurate RFC assessment and do not provide sufficient grounds, standing alone, to reverse a disability determination.  *See Jones v. Astrue*, 619 F.3d 963, 973-74 (8th Cir. 2010).  Nevertheless, GAF scores "may still be used to assist the ALJ in assessing the level of a claimant's functioning," and a "history of GAF scores between 52 and 60, taken as a whole, indicate [that a claimant] has moderate symptoms or moderate difficulty in social or occupational functioning." *Halverson v. Astrue*, 600 F.3d 922, 931 (8th Cir. 2010).

**Side Effects:**   Campbell raises one additional criticism of the ALJ's RFC assessment.  Specifically, he claims that the ALJ did not properly consider the side effects of Campbell's prescribed medication.  Filing No. 18 at 11-12.  The court agrees.  In the section of his decision that sets forth his RFC assessment, the ALJ noted that Campbell's medications cause him to suffer drowsiness and a rapid heartbeat.  Tr. 15-16.  The ALJ did not explain whether he discredited this evidence, but it does not appear that he did so. Nor did the ALJ explain whether, or to what extent, these side effects affected Campbell's ability to work.   In short, it appears that the ALJ acknowledged the evidence that Campbell's medication caused him drowsiness and a rapid heartbeat, but he then ignored this evidence in his analysis of Campbell's RFC.  The relationship between these side effects and Campbell's RFC must be more fully developed on remand.

In opposition to Campbell's argument, the Commissioner suggests that in fact, the ALJ's RFC assessment *does* account for the drowsiness caused by Campbell's medication.  He argues, "the ALJ specifically incorporated into the RFC a finding that Plaintiff could not engage in commercial driving.  This limitation is consistent with Plaintiff's testimony that he could not take his medications and work as a truck driver because they made him sleepy."  Filing No. 21 at 20 (citations omitted).  Campbell did testify that he felt that the drowsiness caused by his medications would prevent him from driving a truck safely.  Tr. 206-207.  However, the ALJ's decision states,

> [Campbell] gets confused if he does not take his medication which he did not take while driving truck.  As a consequence, he was unable to judge distance and got in an accident.  Following the accident he went back on his medication and no longer drives.  His medications also make him sleepy and usually he falls asleep due to his medication.

25

Tr. 15.  It is unclear whether the ALJ's finding that Campbell cannot engage in commercial driving is based on the drowsiness caused by Campbell's medication, the confusion that results when Campbell fails to take his medication, or the combination of the two.  In other words, the court can only speculate whether the ALJ's RFC assessment takes the side effects into account.  Moreover, even if the court assumes that the ALJ's commercial driving restriction is meant to incorporate drowsiness into the RFC assessment, it seems implausible that this drowsiness would eliminate *only* Campbell's ability to engage in commercial driving while having no other effect on his ability to work.  A remand is necessary so that the side effects of Campbell's medication can be properly addressed.

### B.  SSR 82-62

Campbell argues that the ALJ's analysis fails to comply with Social Security Ruling 82-62 and Eighth Circuit cases that require an ALJ to make specific findings not only as to a claimant's RFC, but also as to the physical and mental demands of the claimant's past work.  Filing No. 18 at 12-14.

"[The Eighth Circuit] has held, in accord with Ruling 82-62, that an ALJ has an obligation to 'fully investigate and make *explicit* findings as to the physical and mental demands of a claimant's past relevant work and to compare that with what the claimant [him]self is capable of doing before he determines that [he] is able to perform her past relevant work.'" *Groeper v. Sullivan*, 932 F.2d 1234, 1238 (8th Cir. 1991) (quoting *Nimick v. Secretary of Health and Human Servs.*, 887 F.2d 864, 866 (8th Cir. 1989)).  "A conclusory determination that a claimant can perform past work without these findings . . . does not constitute substantial evidence that the claimant is able to return to his past work." *Ingram v. Chater*, 107 F.3d 598, 604 (8th Cir. 1997) (quoting *Groeper*, 932 F.2d at 1239).

If an ALJ fails to make the necessary findings, reversal is required unless the claimant suffered no prejudice.  For example, a reversal is unnecessary if the record contains substantial evidence that the claimant can perform past work.  *E.g., Battles v. Sullivan*, 902 F.2d 657, 659-660 (8th Cir. 1990).

As explained above, the ALJ's RFC assessment is deficient, and the case must be remanded so that the Commissioner can correct it.  *See supra* Part A.  After Campbell's RFC is properly formulated, the Commissioner will be required to compare this new, corrected RFC assessment with the physical and mental demands of Campbell's past relevant work.  *See* SSR 82-62, 1975-1982 Soc. Sec. Rep. 809 (1982); *Groeper v. Sullivan*, 932 F.2d 1234, 1238 (8th Cir. 1991).  Because the Commissioner already must repeat the SSR 82-62 analysis on remand, Campbell's argument that this case must be remanded for a proper analysis under Ruling 82-62 is moot.

### C.  Dr. Adeladan's Opinion

Finally, Campbell argues that the ALJ erred by discounting Dr. Adeladan's opinion.  Filing No. 18 at 14-17.

Dr. Adeladan was Campbell's treating psychiatrist, and therefore his opinion "is accorded special deference under the social security regulations."  *Vossen v. Astrue*, 612 F.3d 1011, 1017 (8th Cir. 2010) (quoting *Prosch v. Apfel*, 201 F.3d 1010, 1012-13 (8th Cir. 2000)).  *See also Dipple v. Astrue*, 601 F.3d 833, 836 (8th Cir. 2010) (explaining that a treating physician's opinion "will be granted controlling weight when [it is] well-supported by medically acceptable diagnostic techniques and not inconsistent with other substantial evidence in the record.").  An ALJ may discount a treating physician's opinion under certain circumstances, however.  For example, a treating physician's opinion may be given

reduced weight if other medical assessments are supported by superior medical evidence or if the treating physician has offered an inconsistent opinion.  *See Wagner v. Astrue*, 499 F.3d 842, 849 (8th Cir. 2007); *Holmstrom v. Massanari*, 270 F.3d 715, 720 (8th Cir. 2001). *See also Estes v. Barnhart*, 275 F.3d 722, 725 (8th Cir. 2002) (noting that the ALJ must "resolve conflicts among 'the various treating and examining physicians'").  Also, "[w]hen deciding 'how much weight to give a treating physician's opinion, an ALJ must also consider the length of the treatment relationship and the frequency of examinations.'" *Brown v. Astrue*, 611 F.3d 941, 951 (8th Cir. 2010) (quoting *Casey v. Astrue*, 503 F.3d 687, 692 (8th Cir. 2007)).  *See also* 20 C.F.R. § 404.1527(d)(2)(i); 20 C.F.R. § 416.927(d)(2)(i).  "When an ALJ discounts a treating physician's opinion, [s]he should give good reasons for doing so."  *Brown*, 611 F.3d at 951.

In discounting Dr. Adeladan's opinion, the ALJ wrote,

> Psychiatrist Dr. Adeladan concluded that the claimant has significant limitations in the ability to work because of his major affective illness, which makes him unable to hold a job. . . .  Dr. Adeladan's opinion is . . . give[n] little weight as he has only treated the claimant since August 2008 and his records are inconsistent with previous mental health records and with the doctors [sic] own treatment records.  Furthermore, the claimant told the doctor he was hopeful that he might be getting a job soon.

Tr. 17.

Campbell criticizes each of the reasons offered by the ALJ in support of his decision to discount Dr. Adeladan's opinions.  First, he suggests that the brief treatment relationship between Dr. Adeladan and Campbell is mitigated in this case because Dr. Adeladan reviewed Campbell's treatment records.  Filing No. 18 at 14.  There is some evidence indicating that Dr. Adeladan reviewed Campbell's "previous records," *see* Tr. 184; however, the court is not persuaded that a records review makes it inappropriate for an ALJ to

28

consider the length of a treatment relationship when assigning weight to a physician's opinion.

Campbell's next criticism of the ALJ's analysis is on stronger footing.  He notes that, although the ALJ cited inconsistencies between Dr. Adeladan's opinion and "previous mental health records," the ALJ failed to specify precisely what these inconsistencies were. The ALJ's review of the medical record highlights the fact that, according to many prior treatment records, Campbell was "stable," "improved," and "doing well."  Tr. 16.  These records do not provide a strong basis for rejecting Dr. Adeladan's opinion about Campbell's ability to work, however, "because doing well for the purposes of a treatment program has no necessary relation to a claimant's ability to work or to [his] work-related functional capacity."  Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001).  It appears that no treating physician–apart from Dr. Adeladan–either provided or was asked to provide an opinion about Campbell's ability to sustain work, and those physicians' silence on the issue cannot be said to conflict with Dr. Adeladan's opinion.  See Pate-Fires v. Astrue, 564 F.3d 935, 943-944 (8th Cir. 2009); Hutsell, 259 F.3d at 712 ("A treating doctor's silence on the claimant's work capacity does not constitute substantial evidence supporting an ALJ's functional capacity determination when the doctor was not asked to express an opinion on the matter and did not do so, particularly when that doctor did not discharge the claimant from treatment.").

Similarly, the ALJ did not identify any specific inconsistencies between Dr. Adeladan's opinion and his own treatment records, but the ALJ's summary of the treatment records leads the court to infer that the perceived inconsistency arises from the fact that Campbell reported to Dr. Adeladan that he was "doing well" on his medications in

29

September and October 2008.  Tr. 16 (citing Tr. 166, 164).  Again, the fact that Campbell himself opined that he was "doing well" is not in tension with Dr. Adeladan's opinion that Campbell's bipolar disorder rendered him unable to maintain employment.

On balance, the court is persuaded that the ALJ did not provide good reasons for giving "little weight" to Dr. Adeladan's opinion.  The proper weight owed to his opinion must be determined on remand.

IT IS ORDERED that the decision of the Commissioner is reversed and this action is remanded for further proceedings consistent with this Memorandum and Order.

DATED this 8th day of March, 2011.

BY THE COURT

s/ Joseph F. Bataillon
Chief United States District Judge

---

*This opinion may contain hyperlinks to other documents or Web sites.  The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites.  Likewise, the court has no agreements with any of these third parties or their Web sites.  The court accepts no responsibility for the availability or functionality of any hyperlink.  Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.